No. 91,350

STATE OF KANSAS, *Appellee,* v. GIANG NGUYEN, *Appellant.*

(133 P.3d 1259)

704

 

 Opinion
filed May 5, 2006. 

*Korey A. Kaul,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Tamara S. Hicks,* assistant county attorney, argued the cause, and *John P. Wheeler, Jr.,* county attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: For Giang T. Nguyen's (Giang) involvement in actions against the Giang Nguyen family (no relation) on November 11, 2002, he was convicted of first-degree felony murder, aggravated kidnapping, five counts of kidnapping, aggravated burglary, conspiracy to commit kidnapping, and conspiracy to commit aggravated burglary. This court hears his appeal pursuant to K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in allowing into evidence certain information from the confession by coconspirator Ngan Pham? Yes, but it was harmless error.

2. Did the district court err in denying Giang's motion to suppress his own statements to police? No.

3. Did the district court err in allowing into evidence certain photographs? No.

4. Did the district court err in determining that Giang's convictions of felony murder and aggravated kidnapping were not multiplicitous? No.

5. Were Giang's rights of confrontation violated when the district court admitted his own statements into evidence? No.

Accordingly, we affirm.

## FACTS

The Nguyen family lived together in a home located at 522 Colony in Garden City, Kansas. The family consisted of the father, Giang Nguyen; the mother, Bau Tran; two sons, Thang and Thai Nguyen; and two daughters, Ann and Hong Nguyen.

Around 4:30 a.m. on November 11, 2002, Thai entered the garage on his way to work. As he went through the garage, a masked gunman ordered him to put his hands behind his head. The gunman forced Thai into the doorway of the house and pushed him to the floor.

Ann was in the kitchen when she heard Thai make a strange noise. As she looked to see what was going on, two masked gunmen pushed their way into the residence. The men told Ann and her brother Thang to lie down on the floor in the living room.

When the father came out of his bedroom, the gunmen forced him to lie down on the living room floor as well.

One of the gunmen went into the bedrooms; he forced Hong and her mother into the living room at gunpoint and made them lie down next to the other family members.

Three masked gunmen were now in the house. After all the family members were in the living room, one of the gunmen tied

up the family members with ripped T-shirts. He then turned to his associate and said, "Nam, watch them. If they move, shoot them all."

Thang then said, "Nam, what are you doing?" Hong stated, "Nam, whatever you want to take, take it." Ann also stated, "Nam, let us go." Thang then made a break for the kitchen.

While gunman "Nam" pursued Thang, Thang's two sisters ran to the neighbors' house to call the police. After Thang ran into the kitchen, he was shoved to the floor by one of the gunmen and shot twice. Shortly afterward, the three gunmen ran out of the residence.

According to the coroner, Thang died of internal bleeding due to multiple gunshot wounds. One gunshot entered the left side of his chest and eventually lodged in his right thigh, perforating his lung and other organs. This shot was almost straight downward and, according to the coroner, was the most lethal. The other gunshot, which was slightly downward, entered Thang's left back and exited his left chest, then entered and exited his left forearm. The coroner later opined that the back shot happened first.

After hearing of the home invasion on the news, a clerk at the local Kwik Shop called law enforcement to advise that three Vietnamese men had come into the store around 4 a.m. that day. Law enforcement retrieved the surveillance tape which revealed three Vietnamese men later identified as Ngan Pham, the defendant Giang, and his brother Nam Nguyen.

David Falletti, KBI special agent, assisted the Garden City Police Department and took Ngan Pham into custody in Liberal the next day, November 12. After the interview of Ngan Pham, Falletti obtained a search warrant for Pham's 1991 blue Pontiac Firebird. The search revealed a coat which appeared to match one that Pham was wearing in the Kwik Shop tape. The search also revealed a fully loaded Ruger .45 caliber pistol, a fully loaded Smith and Wesson 9 mm pistol, a fully loaded Smith and Wesson .40 caliber pistol, an FEC .45 caliber pistol, and a loaded .22 caliber RG Industries revolver, plus five black ski masks, numerous yellow gloves, and a water bottle that was similar to the bottles that had been purchased from the Kwik Shop.

Giang voluntarily turned himself in to Saline County authorities on November 13, 2002, 2 days after the home intrusion. Garden City Detectives Jerry Schiffelbein and Larry Watson drove to Salina to interview him. After the detectives obtained Giang's written confession with the aid of an interpreter, Watson transported him to the Finney County jail in Garden City.

*Motion to Suppress*

Giang filed a motion to suppress the statements he made to Garden City detectives on November 13. Specifically, he alleged that the interpreter used during the interview was not qualified under K.S.A. 75-4351(e); that he did not understand the rights he waived; and that he was not readministered *Miranda* warnings prior to being asked questions by Watson on the drive to Garden City.

At the suppression hearing detectives Schiffelbein and Watson, interpreter Dam Dinh, and Giang all testified.

Dam Dinh testified that he assisted Garden City detectives in interpreting Vietnamese during the interview. According to Dinh, he grew up in Vietnam, came to the United States when he was 16 years old, and was 31 at the time of the suppression hearing. He described himself as being "pretty much" fluent in English, having learned it by attending high school in the United States. He had translated for Dodge City High School and the Dodge City Police Department between 1992 and 1995 and was currently the main interpreter for the Saline County Police Department. Dinh testified he had not taken any courses on interpreting.

Dinh testified that during the interview he, two detectives, and Giang were present. He translated the detectives' questions into Vietnamese and Giang's answers into English. He had no problems communicating with Giang and believed that Giang understood what he was saying. He also testified that he understood what Giang was saying to him and to the detectives. Dinh testified that he interpreted for Giang to the best of his ability. He did not believe Giang was under the influence of alcohol or drugs, and Giang appeared to be "lucid" and "understanding."

According to Dinh, he was compensated by Finney County for the services he provided. He did not know Giang, the decedent Thang Nguyen, Thang's family, or any of the police officers involved in the investigation.

Dinh further admitted that before interpreting for Giang, he did not ascertain which part of Vietnam Giang was from. He testified that the cultural differences between South and North Vietnam are subtle, but there is a difference in accent.

Detective Schiffelbein then testified, stating that Detective Larry Watson and Dam Dinh assisted him with Giang's interview which began at 3:58 p.m. and lasted almost 3 hours.

According to Schiffelbein, the detectives identified themselves through the interpreter and explained to Giang that they needed to speak with him about incidents that had happened in Garden City. The interpreter and Giang were each provided with a copy of *Miranda* warnings translated into Vietnamese, while Schiffelbein retained an English copy. Schiffelbein read aloud the *Miranda* warnings in English, and after he completed each line, the interpreter repeated them to Giang in Vietnamese. After the completion of reading each line, Giang was instructed to initial his *Miranda* form if he understood what was advised of him.

Schiffelbein testified that Giang did not verbally respond after the reading of each *Miranda* line, but he initialed next to each statement as Schiffelbein had requested. Schiffelbein then asked Giang if he understood each of these rights as had been explained to him, and Giang responded "Yeah" in English. Schiffelbein then asked Giang if he would "speak . . . having his [*Miranda* rights] in mind," and Giang said he would.

According to Schiffelbein, Giang said he was 24 years old, had grown up in Vietnam, and had completed the 6th grade there. He came to the United States in 1996 and went to high school for approximately 2 months. At the time of the interview, Giang had been in the United States for 6 years.

Schiffelbein testified that he did not threaten Giang or promise him anything in order to coerce Giang to elicit a response. According to Schiffelbein, Giang did not indicate that he did not want to talk to the detectives, and he did not ask for an attorney. In

addition, Schiffelbein stated that Giang did not ask for a break or to use the bathroom. Although two breaks were taken, Giang opted not to use the restroom but was given a soda.

Based on Schiffelbein's observations, Giang did not appear to be under the influence of drugs or alcohol, but rather appeared relaxed and cooperative. Giang occasionally answered the detective's questions without the use of the interpreter and provided short answers in English. On occasion, Giang asked to have the question repeated. The interview was video recorded by the Saline County jail; however, there was no audio on the tape. During the interview Giang was leg-shackled to his chair.

Schiffelbein asked Giang to make a written statement, and Giang agreed. He was not readministered *Miranda* warnings prior to giving the written statement. After this statement was obtained, Giang was escorted to the Saline County jail, where he was held until he was transported back to Garden City.

According to Giang's hearing testimony, he did not understand the interpreter all of the time. He further stated that he can read Vietnamese but has trouble with pronunciation. Finally, he testified that during the interview he was concerned and upset for his girlfriend because she was expecting a child soon.

Detective Watson also testified, stating he was involved with the Salina interview. Beginning at 9:07 p.m., approximately 2 hours after the interview was conducted, Watson transported Giang to Garden City. Giang rode in the passenger seat of the truck secured to the seat belt with leg shackles and handcuffs.

According to Watson, he and Giang engaged in "small talk" in English during the beginning of the trip. Giang initiated the conversation by asking what was going to happen to him. Watson informed Giang that he could not answer those types of questions. The conversation transitioned to what things were like over in Vietnam and the quickest way to get from Salina to Garden City. Giang fell asleep around Ellsworth and did not wake until several hours later when they were outside Garden City.

Watson testified that shortly after Giang awoke, he asked Giang to show him where the incident occurred. Giang told the detective that he would point out the location, but he did not want to stay,

because the people there did not like him. Watson followed Giang's directions, and Giang pointed to and described the house at 522 Colony. Giang was then delivered to the Finney County jail.

Watson testified that he is approximately 6 feet 3 inches tall and weighs 240 pounds; Giang is 5 feet 6 inches tall and of small build. Watson stated that during the approximate 3-hour drive, Giang did not request to stop and use the restroom; he also did not volunteer whether he was hungry or thirsty. He admitted that Giang was not readministered *Miranda* warnings before any of the truck conversation from Salina to the Finney County jail.

According to Giang's hearing testimony, during the drive to Garden City the detective did not ask him if needed to go to the bathroom or if he wanted food or a drink. He also testified he was too afraid to ask the detectives for these items.

The district court denied Giang's motion to suppress and ruled on two of Giang's specific arguments:

"[1] Well, let's deal with the question of the interpreter first. The statute says that a qualified interpreter shall be appointed. First of all, the State does not have, to my knowledge, a general qualification standard for interpreters, either Vietnamese, Spanish, or any other language except perhaps for the signing, deaf and dumb folks. So the Court has to consider the qualifications of an interpreter on a case-by-case basis.

"In this case I find that Dam Dinh was qualified based on his experience, and his testimony here in court clearly showed to me that he at least can speak English and there was no challenge to his ability to speak Vietnamese. . . .

"[2] With regard to the *Miranda* issue, it appears to the Court that from observation at least by three people, that the defendant was not under the influence of any drugs, alcohol, or any other emotional distress that was readily apparent to those who were in the room, that he was not threatened, coerced or in any way forced into making a statement. That he understood, as near as we can tell, the questions that were asked to him and the answers that he provided through the interpreter. They seem to be apparently voluntary. And level of education was such that he could clearly understand the nature of the proceedings against him. Obviously the interpreter at the time, Mr. Dinh, had had experience with law enforcement and legal matters and should have been and I'm convinced that he was, able to convey those legal concepts to the defendant."

The court did not separately address the admissibility of Giang's statement to Watson during the truck ride from Salina to Garden City.

*Jury Trial*

At trial, Watson verified photographs he had taken during the autopsy of Thang Nguyen. Exhibit 58 depicts Thang lying on his back, shirtless, exposing two gunshot wounds on the left side. Exhibit 54 is a close-up shot of Thang's face. The defense objected arguing the two exhibits were cumulative and overly gruesome. The court overruled the objection after the State offered the following:

"The photograph 54 is used—will be used by the State to simply establish the identity of the person upon whom the autopsy was performed by the pathologist. The photograph 58 will be used by the State . . . to assist the jury in determining and to show the jury various entrance and exit wounds on the body. They are not depicted over and over and over again, Your Honor."

The Nguyen family members testified to the events at the time of the home intrusion. In addition, Hong testified she had told police that when one of the gunmen put his gun to her head and told her to put her hands up, she recognized Giang's voice because she had worked with him and talked to him on several occasions at IBP. She then identified Giang as that person in the courtroom.

Ann also testified that she recognized a gunman other than Giang. Upon hearing one gunman call another one "Nam," she looked up and recognized Nam Nguyen. She testified that she was able to recognize him because she had worked with him at IBP.

Detective Brian Ruder testified about the photographs depicting Giang entering the Kwik Shop at 3:17 a.m. the day of the intrusion. Other photographs depicted Giang, his brother Nam, and Ngan Pham at the checkout counter buying bottled water.

To support the State's conspiracy counts Agent Falletti was called to testify about parts of the interview he conducted with Ngan Pham on November 12, 2002, in Liberal. The defendant objected on hearsay grounds, and the court overruled the objection.

According to Falletti, Pham told him that on November 10, 2002, in the parking lot of the Ton-Ton pool hall in Liberal, he discussed with both Nam and Giang Nguyen what they were going to do when they arrived in Garden City. Pham indicated that the

three men drove to Garden City in Pham's 1991 blue Pontiac Firebird, stopped at the local "Kwik Trip" to purchase some items, and then parked in front of 522 Colony. At Pham's instruction, one of the individuals cut Pham's T-shirt into strips to tie up the home occupants. All three men wore black ski masks and were armed: Pham carried a silver .45 caliber pistol, Giang carried a .45 caliber pistol provided by Pham, and Nam carried a 9 mm pistol. According to Pham, they were after the Nguyen family's money.

The State called interpreter Dam Dinh and Detective Schieffelbein to testify about the interview they conducted in Salina. Dam Dinh's testimony did not provide any new or contradicting facts from the testimony he gave at the suppression hearing. The defense renewed its objection to Detective Schiffelbein testifying about Giang's Salina confession, which was overruled.

Schiffelbein told the jury that through the interpreter, Giang informed the detectives that on November 10, 2002, he met with Nam Nguyen and Ngan Pham in Liberal to discuss robbing some people in Garden City. Giang told the detectives the three men drove in Ngan Pham's vehicle and arrived in Garden City at approximately 4:40 a.m. on November 11, 2002. They first stopped off at a gas station to buy some water, and then drove to a residence, but Giang was unsure of the address or street name. When they arrived at the residence, the three men waited in the car for roughly 25 minutes. While they were waiting they put on ski masks and yellow gloves; all three possessed handguns. When the garage door to the residence opened, Nam Nguyen and Ngan Pham left the vehicle and approached the person who had left the house. Giang initially stayed in the car but eventually entered the residence.

Once in the residence, Giang went through the house in order to locate more people. He went into one of the upstairs bedrooms and forced one of the daughters into the living room at gunpoint. After all the family members were in the living room, Giang continued through the house looking for money.

According to Schiffelbein, Giang told the detectives that while in one of the back bedrooms, he heard a commotion in the living room and came out to investigate. He saw his brother, Nam, fight-

ing in the kitchen with Thang Nguyen. Ngan Pham then ran up, shoved Thang to the floor, and shot him twice. Shortly after the gunshots were fired, he, Nam Nguyen, and Ngan Pham all ran out of the residence. They got into Pham's vehicle and drove to Wichita. Once in Wichita the three men split up, and Giang gave his gun, gloves, and ski mask back to Ngan Pham. Giang went to stay with his girlfriend in Salina and turned himself in to the Saline County authorities after hearing that Ngan Pham had been arrested.

The State proffered Detective Watson's testimony. After hearing the proffer, the court ruled as follows:

"If the testimony comes in as the State has proffered, I'm going to find that once he was *Mirandized* for the day, that the statements were not coerced from him; that he freely and voluntarily gave this information to the detective and that he—the statements would be admissible."

Watson then testified similar to his suppression hearing testimony about his conversation with Giang on the truck drive from Salina to Garden City.

The jury found Giang guilty of first-degree felony murder, aggravated kidnapping, five counts of kidnapping, aggravated burglary, conspiracy to commit kidnapping and conspiracy to commit aggravated burglary, but not guilty on six counts of aggravated robbery for some missing jewelry. He was sentenced to life in prison with the possibility of parole in 20 years. He was also sentenced to 165 months for aggravated kidnapping to be served consecutive to the life sentence, with concurrent sentences on the remaining counts.

## ANALYSIS

Issue 1: *Did the district court err in allowing into evidence certain information from the confession by coconspirator Ngan Pham?*

Giang first contends that Agent Falletti's testimony describing certain information obtained from his interview of Ngan Pham was wrongfully admitted into evidence because Giang was not given the opportunity to cross-examine Pham as required by *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354

(2004). The State responds that the district court correctly allowed the testimony under K.S.A. 60-460(i)(2) because Giang was charged with conspiracies. Our standard of review is de novo. See *State v. Carter*, 278 Kan. 74, 77-78, 91 P.3d 1162 (2004) (when the underlying facts are undisputed, this court's review of whether a Confrontation Clause issue arose is de novo).

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." See *Crawford v. Washington*, 541 U.S. at 42. The controlling law during Nguyen's jury trial, *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), held that the statement of a hearsay declarant who is unavailable for trial may be admitted only if it bears "adequate 'indicia of reliability.' " 448 U.S. at 66. Under *Roberts* a statement will be admitted if it falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S. at 66.

Falletti's testimony describing certain information from his interview of Ngan Pham was admitted into evidence per *Roberts* under K.S.A. 60-460, which states:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(i) As against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination . . . ."

Approximately 1 year after Giang's April 2003 jury trial, however, the United States Supreme Court limited *Roberts'* reach. In *Crawford v. Washington*, the Court held that out-of-court statements by witnesses that are testimonial are barred under the Confrontation Clause unless witnesses are unavailable and the defendant had a prior opportunity to cross-examine regardless of whether such statements are deemed reliable by the court. 541 U.S. at 68. The Court also held that police interrogations constitute testimo-

nial hearsay: The Clause's "primary object" is testimonial hearsay, and "interrogations by law enforcement officers fall squarely within that class." 541 U.S. at 53.

Giang's appeal was pending at the time *Crawford* was released in March 2004. We applied *Crawford's* holding in *State v. Meeks,* 277 Kan. 609, 88 P.3d 789 (2004), which was on appeal at the time of *Crawford's* release. See also *Whisler v. State,* 272 Kan. 864, 36 P.3d 290 (2001) ("The court's general rule with regard to application of an overruling decision has been stated as applying the decision 'retroactively to all similar cases pending as of the date of the overruling decision, regardless of when the cause of action accrued.' "). Accordingly, under *Meeks* and *Whisler* the *Crawford* decision applies retroactively to the instant case.

Agent Falletti testified he was conducting an interrogation; there is no doubt that Pham's responses are testimonial. For reasons undisclosed in the record on appeal, Pham did not testify at Giang's trial or other proceedings, denying Giang the opportunity to confront him through cross-examination. We hold that the admission of parts of coconspirator Pham's confession violated Giang's Sixth Amendment right of confrontation and this evidence should have been excluded. See, *e.g., United States v. Rodriguez-Marrero,* 390 F.3d 1, 15-17 (1st Cir. 2004); *United States v. McClain,* 377 F.3d 219, 222 (2d Cir. 2004). Accordingly, K.S.A. 60-460(i) cannot serve as a basis for admission.

Giang argues that even if *Crawford* did not trump K.S.A. 60-460(i) under these circumstances, Pham's confession was not made "while the plan was in existence" as the statute requires. The State responds that the plan was still in existence because not all of the conspirators had been arrested at the time of his confession. Although now unnecessary to our resolution of the Pham issue, for future reference we address the prosecution's use of the statute.

*State v. Myers,* 229 Kan. 168, 625 P.2d 1111 (1981), supports Giang's argument. There, this court considered the admissibility of statements—by an alleged coparticipant implicating the defendant in a homicide—which were made approximately 3½ hours after the homicide occurred. We held:

"Under K.S.A. 60-460(i)(2), hearsay statements made by a coparticipant which implicate the accused in a crime are admissible against the accused only while the plan to commit the crime is in existence and 'before its complete execution or other termination.' Under this exception, this court has consistently held that hearsay statements of a coconspirator or coparticipant which implicate the accused *and are made after the crime has been consummated are not admissible against the accused.* [Citations omitted.]" (Emphasis added.) 229 Kan. at 173.

Here, Pham's confession was made to Falletti a day after the home intrusion occurred. By then, the conspirators had left Garden City and at least Pham and Giang had gone to Liberal and Salina, respectively. Nothing in the record indicates they planned on returning to 522 Colony. Accordingly, the confession was given after the "complete execution" of the crime and, even absent *Crawford,* K.S.A. 60-460(i) could not provide a basis for its admission into evidence.

*Harmless Error*

The State contends that even if the confession excerpts were erroneously admitted, the error was harmless. We have held that when reviewing a constitutional challenge to the admission of evidence, we apply the federal harmless error rule. *State v. Atkinson,* 276 Kan. 920, 930, 80 P.3d 1143 (2003) (Confrontation Clause violation). Post-*Crawford,* a number of federal circuit courts of appeal have specifically subjected *Crawford* violations to harmless error analysis. See *United States v. Summers,* 414 F.3d 1287, 1303-04 (10th Cir. 2005); *United States v. Pugh,* 405 F.3d 390, 400-01 (6th Cir. 2005); *United States v. McClain,* 377 F.3d at 222; *United States v. Rodriguez-Marrero,* 390 F.3d at 18.

Under the federal constitutional rule, "an error may not be held to be harmless unless the appellate court is willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]" 276 Kan. at 925.

In *Atkinson,* we approvingly cited the following passage from *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986), to explain application of the harmlessness rule in the particular context of a Confrontation Clause issue:

" 'The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' [Citation omitted.]" 276 Kan. at 930.

Giang argues, however, that we should first apply the state harmless error rule contained in K.S.A. 60-261, which provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

According to Giang's brief, violation of his Sixth Amendment confrontation right is "inconsistent with substantial justice" and most certainly affects his substantial rights. He argues that the state harmlessness inquiry, unlike the federal, is not a review of whether there was sufficient evidence presented that a defendant would have been convicted without the offending evidence, but rather a review to determine whether he or she ultimately received a fair trial, i.e., an invitation for us to "look at the procedures." He asserts that where, as here, a defendant was denied one of the fundamental requirements we employ to ensure a fair trial, it cannot be said that his trial was fair.

Giang's counsel elaborated upon this point at oral arguments. He claimed that reversal is particularly required when the trial-absent, previously uncross-examined declarant is a coconspirator in police custody, i.e., one who has the incentive to exculpate himself or herself and to inculpate the defendant as much as possible.

According to Giang, only if the State demonstrates that the error was harmless under K.S.A. 60-261 does this court proceed to the federal standard that requires us to declare beyond a reasonable

doubt that the error had little, if any, likelihood of having changed the result of the trial. He acknowledges that we have only applied the two-step analysis recently in two cases, both involving prosecutorial misconduct: *State v. Tosh,* 278 Kan. 83, 91 P.3d 1204 (2004), and *State v. Donesay,* 265 Kan. 60, 959 P.2d 862 (1998).

We first observe that as recently as 2003, in *Atkinson*—where we found a violation of the Confrontation Clause because a defendant was limited in his cross-examination of the victim—we applied only the federal harmless error standard.

By analogy, even more recently, in *State v. Swanigan,* 279 Kan. 18, 106 P.3d 39 (2005), we held that the erroneous admission of a defendant's involuntary confession was measured by the federal harmless error standard. Moreover, we disapproved language from our earlier case law that suggested the admission was structural error, *i.e.,* requiring automatic reversal. We cited *Arizona v. Fulminante,* 499 U.S. 279, 296, 309, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991), which held that although "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him," the admission of a coerced confession is a "trial error" and not a structural defect affecting the framework within which the trial proceeds. Accordingly, in *Fulminante* the Supreme Court held that the harmless error rule applied. See *Neder v. United States,* 527 U.S. 1, 8, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999) (so-called structural errors subject to automatic reversal exist in a very limited class of cases).

Because we have applied only the federal harmless error rule in Confrontation Clause cases, and because we have applied only the federal harmless error rule in cases involving the defendant's own involuntary confession—which the Supreme Court has held is probably the most probative and damaging evidence that can be admitted against a defendant—we see no reason to deviate from applying only the federal rule to the erroneous admission of the absent coconspirator's statements in the instant case.

Moreover, in both *Donesay* and *Tosh* we concluded that the prosecution's conduct was so prejudicial that it ultimately denied the defendants a fair trial, our overarching consideration. In *Donesay,* we held that the widow's 28 pages of testimony about her

police officer husband's relationship with her, other family members, and friends was patently irrelevant to any material fact of the crimes charged. After noting that the only real question was whether the killing of her husband was premeditated, we concluded the testimony was deliberately presented by the prosecutor for the obvious purpose of infuriating and inflaming the jury, *i.e.*, intended to improperly influence the jury and prejudice Donesay's right to a fair trial. See *Donesay*, 265 Kan. at 89.

In *Tosh*, we held that the prosecutor engaged in misconduct in four different instances: his comments during cross-examination of a defense witness, his questioning of the defendant, his different comments during his initial closing argument, and his comments during his rebuttal closing argument. We concluded that the cumulative effect of the four incidents required reversal. Among other things, we held that the prosecutor's improper cross-examination of the defendant was done in bad faith to put before the jury highly prejudicial, false, and inadmissible evidence. 278 Kan. at 98. We concluded:

"As in *Donesay*, the admission of [all] this evidence was inconsistent with substantial justice and was intended to inflame the jury. The prosecutorial misconduct in the present case was so egregious, gross, flagrant, and prejudicial that Tosh's conviction must be reversed and he must receive a new trial." 278 Kan. at 98.

Accordingly, even if we were to use Giang's proposed two-step analysis, the first step—K.S.A. 60-261 as applied in *Donesay* and *Tosh*—does not provide him relief. The facts simply do not support the intentional State conduct that was designed to inflame the *Donesay* and *Tosh* juries. Here, the State simply offered only portions of Pham's confession through Falletti. Because the evidence was provided only to support the conspiracy claims, those portions appear to be carefully limited to the events before the masked men entered the house at gunpoint, kidnapped the entire Nguyen family, and shot Thang to death. In short, this evidence, admittedly in violation of Giang's constitutional right of confrontation, did not prevent him from receiving a fair trial.

Now that we limit our review to application of the federal standard for harmless error we observe:

The parts of Pham's confession that were admitted essentially confirmed the same aspects of Giang's confession. Both men indicated they met with each other in Liberal, along with Nam Nguyen on November 10, 2002, to discuss robbing a family in Garden City. Their statements both indicated that the three men drove in Pham's car to Garden City and stopped at the local Kwik Shop. Finally, both statements indicated that before entering the house they donned black ski masks, grabbed loaded handguns, and entered the home to look for money.

The State also presented evidence independent of Pham that corroborated Giang's confession. All of the family members essentially testified to the same order of events as described in Giang's confession. Additionally, the Garden City Kwik Shop surveillance photos corroborate Giang's statement that the three men from Liberal stopped there early in the morning before proceeding to 522 Colony. The photographs taken of the .45 caliber and 9 mm handguns, black ski masks, and yellow gloves found in Pham's car on November 12, 2002, are consistent with Giang's confession that he gave the items he used in the intrusion back to Pham before leaving Wichita the day before. Hong Nguyen testified that she recognized Giang, a former coworker, as one of the gunmen after hearing his voice. Ann Nguyen testified to recognizing her former coworker, Giang's brother Nam, after one of the other gunmen referred to him as "Nam."

In short, having reviewed the factors identified in *Atkinson,* 276 Kan. at 930, including the overall strength of the prosecution's case, we conclude the error was harmless because it had little likelihood of changing the result of the trial. See *United States v. Rodriguez-Marrero,* 390 F.3d at 8 (erroneous admission of absent coconspirator's statement had little likelihood of changing the result of the trial); *United States v. McClain,* 377 F.3d at 222-23 (same).

Issue 2. *Did the district court err in denying Giang's motion to suppress his own statements to police?*

Next, Giang contends that his own statements to the police should be suppressed for three reasons: (1) The interpreter was not qualified under K.S.A. 75-4353; (2) Giang should have been

readministered *Miranda* warnings before giving his statement to Detective Schiffelbein in Salina and before his later statement to Detective Watson on the way from Salina to Garden City; and (3) his statement to Detective Watson was coerced. The State responds that Giang's statements were voluntary and uncoerced and that no additional *Miranda* warnings were required after Giang's waiver.

In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. *Swanigan,* 279 Kan. 18, Syl. ¶ 1.

*Interpreter*

K.S.A. 75-4353 sets forth the required qualifications for interpreters:

"(a) No one shall be appointed to serve as an interpreter for a person pursuant to the provisions of K.S.A. 75-4351, and amendments thereto, if such interpreter is married to that person, related to that person within the first or second degrees of consanguinity, living with that person or is otherwise interested in the outcome of the proceeding, unless the appointing authority determines that no other qualified interpreter is available to serve.

. . . .

"(c) In appointing a qualified interpreter for a person whose primary language is other than English pursuant to the provisions of K.S.A. 75-4351 et seq., and amendments thereto, the appointing authority shall appoint: (A) A qualified interpreter who meets the following criteria; . . . :

(1) A general understanding of cultural concepts, usage and expressions of the foreign language being interpreted, including the foreign language's varieties, dialects, and accents;

(2) the ability to interpret and translate in a manner which reflects the educational level and understanding of the person whose primary language is other than English;

(3) basic knowledge of legal rights of persons involved in law enforcement investigations, administrative matters and court proceedings and procedures, as the case may be; and

(4) sound skills in written and oral communication between English and the foreign language being translated, including the qualified interpreter's ability to translate complex questions, answers and concepts in a timely, coherent and accurate manner."

Giang argues that there is insufficient evidence to demonstrate that the interpreter, Dinh, satisfies the statutory requirements. He claims that Dinh violates the statute because he had an interest in the interrogation proceedings; did not possess the ability to interpret and translate in a manner which reflects the education level and understanding of a person whose primary language is other than English; and did not have the basic knowledge of legal rights of persons involved in law enforcement investigations, administrative matters, and court proceedings and procedures.

As far as interest in the proceedings, Dinh testified that he was paid by Finney County for his interpreting services during the interrogation. He also testified that he was not threatened with nonpayment if he did not do what the officers wanted him to do. He did not know Giang, the victim Thang, Thang's family, or any of the officers involved in the matter. He was also paid for his services at trial.

As far as ability to interpret and translate, Dinh's cradle language is Vietnamese; he learned English by attending high school in the United States beginning 15 years ago. Although there are differences in accents between South and North Vietnamese, he stated he had no problem communicating with Giang in Vietnamese, he understood Giang, and he believes that Giang understood what he was translating.

As far as basic understanding of legal rights, Dinh testified that he began interpreting Vietnamese for law enforcement in 1992. During the 10 years preceding Giang's interrogation, Dinh likely acquired basic knowledge of legal procedures. He is currently the main interpreter for the Saline County Police Department.

Giang argues that he received little education in Vietnam; that he therefore had trouble understanding Dinh at times; and that Dinh neglected to inform him of his right to an attorney. Dinh, however, is an experienced law enforcement interpreter, and Schiffelbein testified that Dinh read each *Miranda* warning element to Giang. When Schiffelbein asked if Giang understood all of his rights, Giang replied, "Yeah." This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *Swanigan,* 279 Kan. at 23.

Substantial competent evidence supports the trial court's finding that Dinh was qualified based on his experience and that he was able to properly convey Giang's legal rights to Giang, factors to be considered in the totality of circumstances for ultimately determining the voluntariness of Giang's statement. *Cf. State v. Zuniga*, 237 Kan. 788, 791-92, 703 P.2d 805 (1985) (Whether or not an interpreter is appointed and is present at the taking of the statement, the trial court must still determine whether an in-custody statement was freely, voluntarily, and knowingly given, with knowledge of the *Miranda* rights. That determination must be based upon the totality of the circumstances.).

*Readministering Miranda*

Giang argues that although he received *Miranda* warnings at 4 p.m., which he waived in writing before his oral confession, he should have been readministered *Miranda* warnings prior to providing his written statement at 6 p.m. and prior to his interrogation by Detective Watson during the latter stages of the trip from Salina to Garden City that began at 9:07 p.m.

We recently analyzed when suspects need to be re-*Mirandized* after waiver of those rights in *State v. Mattox*, 280 Kan. 473, 124 P.3d 6 (2005). Greatly summarized, we held that the answer is a conclusion of law made by considering the totality of the circumstances. One factor for consideration is the time interval between the waiver of one's *Miranda* rights and the giving of his or her statement. *Mattox*, 280 Kan. at 487-88.

Under the rationale of *Mattox*, we conclude as a matter of law that it was unnecessary for Detective Schiffelbein to readminister *Miranda* to Giang. Giang was advised of his *Miranda* rights through the use of an interpreter and signed a waiver at 4:04 p.m. He then orally confessed. Around 6 p.m., Giang agreed to make a written statement. The same detective who administered *Miranda* to Giang—Schiffelbein—also took his statements. There is no evidence in the record that anything happened after the waiver that affected Giang's understanding of his rights. See, *e.g., Brown v. State*, 661 P.2d 1024, 1031 (Wyo. 1983) (totality of circumstances considered to determine "whether the prior [*Miranda*] warnings

were effective to sufficiently advise the accused of his constitutional rights so that the prior voluntary and knowing waiver of those rights continued its efficacy").

As for Detective Watson's failure to re-*Mirandize* Giang, we observe that he picked up Giang at 9:07 p.m., approximately 5 hours after the *Miranda* warning was administered and the rights waived, and delivered him to the jail in Garden City at approximately midnight. Under the rationale of *Mattox*, a waiver does not expire through the mere passage of 5 to 8 hours when a suspect has been in continuous custody. See, *e.g.*, *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (1-day interval between waiver of *Miranda* rights and defendant's statement to law enforcement not unreasonable under circumstances). Nor is there anything in the record to suggest Giang did not understand his *Miranda* rights during that ride, particularly when Watson was one of the detectives present when Giang had been *Mirandized,* waived his *Miranda* rights, and confessed in Salina earlier that evening. We therefore conclude as a matter of law that Giang's waiver in Salina continued its efficacy. See *Brown v. State*, 661 P.2d at 1031 (waiver of *Miranda* rights continued its efficacy).

*Voluntariness of Statements Given On Transport to Garden City*

Next, Giang argues that the district court erred in admitting the statement given in the truck to Detective Watson because it was not voluntary under the totality of the circumstances. According to Giang, the statement consisted solely of his "direct[ing] Detective Watson to the house that was robbed." The entire factual allegation for his argument is as follows:

"Here, Giang had been shackled on the legs, handcuffed and those cuffs were connected by another chain for a three hour drive, locked in the vehicle with the much larger, much heavier Detective Watson. Because he was locked up in a car with Detective Watson, Giang had no opportunity to speak with anyone in the outside world. Detective Watson knew that Giang was a young man who had minimal education and was from a completely different culture. Detective Watson unfairly began his questioning when Giang was most vulnerable, having just woken up."

In determining whether a confession is voluntary, a court is to look at the totality of the circumstances, including the duration and

manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. *Swanigan*, 279 Kan. 18, Syl. ¶ 2. An additional circumstance for consideration is the accused's fluency in the English language. *State v. Garcia*, 243 Kan. 662, Syl. ¶ 8, 763 P.2d 585 (1988). The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *Swanigan*, 279 Kan. 18, Syl. ¶ 2.

The burden of proving the statement was voluntary rests with the State. *State v. White*, 275 Kan. 580, Syl. ¶ 8, 67 P.3d 138 (2003). See K.S.A. 22-3215(4).

At the outset, we observe that Giang's directing Detective Watson to 522 Colony came 1 day after coconspirator Ngan Pham, and only several hours after Giang himself, had provided numerous details to law enforcement about the planning and execution of the crime of aggravated burglary, which resulted in multiple kidnappings and a murder in the Nguyen home in Garden City. Accordingly, any error in the admission of Giang's truck statement pointing out the specific location of the crimes would be harmless. See *State v. Swanigan*, 279 Kan. 18.

Giang's argument that he was adversely affected by the duration and manner of the interrogation because he was handcuffed during the entire drive, and Detective Watson was a much larger and intimidating figure, is greatly diluted by the fact that Watson testified Giang fell asleep not long after the trip began and awakened only near its end approximately 3 hours later. Additionally, in *State v. Harris*, 279 Kan. 163, 168, 105 P.3d 1258 (2005), this court ruled that being shackled to the floor for 7 hours during an interrogation did not weigh in favor of finding a confession involuntary. Under *Harris*, the fact that Giang was handcuffed and shackled during the trip to Garden City does not alone render his statement involuntary.

As for an intimidating presence, this court addressed the issue in *State v. Bell*, 276 Kan. 785, 80 P.3d 367 (2003). There, the interrogator made

"some questionable comments to the defendant. For example, he told the defendant to tell the truth or suffer the consequences. When the defendant said that he did not care about the stripes on the officer's uniform, Sergeant Miller told the defendant that the defendant was going to have a lot more stripes of his own, seemingly in reference to a prison uniform. When leaving the interview, Sergeant Miller told the defendant that he would see him again." 276 Kan. at 798.

The court ruled:

"These comments, while seemingly improper, do not affect the voluntariness of the defendant's statement when viewing the entire interview as a whole. Sergeant Miller did not raise his voice, stand up, or act in a threatening manner toward the course of the interview. The defendant's will was not overborne, as he frequently argued with Sergeant Miller and eventually asked him to leave the interview." 276 Kan. at 798-99.

Here, Detective Watson did not threaten Giang or use force against him. When Giang inquired about what was going to happen to him, Watson responded that he could not answer those types of questions. Giang testified that he was too afraid to ask for food or to go to the bathroom, but Giang also initiated conversation with the detective and engaged in small talk. Although Detective Watson may have appeared intimidating to Giang, under *Bell,* the detective's demeanor did not affect the voluntariness of Giang's statement.

As for Giang's claims that he was isolated in the truck and denied access to the outside world, in *Harris* this court ruled a defendant was not denied access to the outside world even after being denied a request to phone an alibi. 279 Kan. at 168-69. Likewise in *Bell,* this court ruled that the officers' refusal to allow defendant to see his mother did not render the statements involuntary. 276 Kan. at 798. Watson testified that Giang did not request to speak with an attorney or to anyone else and never requested to be let out of the car, to use the restroom, or to get something to eat or drink. In fact, he slept much of the way. Giang was not denied the ability to communicate with the outside world.

Regarding Giang's age, intellect, and background, he was 24 years old at the time of the truck ride. He had grown up in Vietnam and completed the 6th grade in Vietnam. Giang came to the United States in 1996 and attended high school for approximately 2

months before dropping out. Giang was convicted of criminal trespassing 3 years prior to his current arrest.

Finally, regarding Giang's claim that Detective Watson unfairly questioned him knowing his minimal education and background and his having been recently awakened, Watson testified that Giang initiated the trip's conversation with him in English and Watson understood Giang's responses: "He had a very pronounced accent, but it was—made it difficult to understand him sometimes but I could understand what he was talking about. We conversed for quite a bit and I could understand his English."

Giang also possessed the ability to give directions in English. Detective Watson testified:

"We got to the exit and on ramps off of 156 and the bypass, and he told me to go north—excuse me, south on the bypass. We went south on the bypass and came to the light at Spruce, and he told me to make a right onto Spruce, which I did, and I continued west on Spruce and then he told me to go south on Colony."

Based on Watson's testimony, we conclude his asking Giang to point out the Nguyen home did not unfairly take advantage of Giang's education and background. See *State v. Nguyen,* 251 Kan. 69, 78, 833 P.2d 937 (1992) (officers did not act unfairly in continuing interrogation after defendant informed them of his difficulty with the English language because officers asked open-ended questions and when defendant decided to cooperate he had no trouble understanding and communicating).

As for Giang having been recently awakened and therefore at his most vulnerable, Watson's testimony indicates sufficient time elapsed, from Giang's waking up outside of town until he eventually pointed out the house, as to make this factor insignificant.

As stated previously, Giang was read his *Miranda* rights through the use of an interpreter, signed a waiver, and then provided substantial details of the crime in Salina. Under the totality of the circumstances, including English as Giang's second language, we can independently conclude as a matter of law that his later statements regarding the location of the crime scene were made freely, knowingly, and understandingly with full knowledge of his *Miranda* rights. See *Garcia,* 243 Kan. 662; see also *State v. Swanigan,* 279

Kan. 18, Syl. ¶ 1, 106 P.3d 109 (2005) (whether confession is voluntary is conclusion of law).

The district court properly admitted Giang's statements at trial.

Issue 3: *Did the district court err in allowing into evidence certain photographs?*

Giang argues that exhibits 54 and 58 are repetitive and of little probative value. He contends the State was allowed to produce duplicative testimony from the coroner by having her explain what injuries the victim Thang sustained and then repeat the same testimony with the pictures of that injury. As at trial, the State contends these exhibits were used to show the identity of the person upon whom the autopsy was performed and also to assist the jury in determining the entrance and exit wounds.

Giang does not dispute the photographs' relevance, our threshold consideration when considering their admissibility. See *State v. Torres*, 280 Kan. 309, 121 P.3d 429 (2005). When reviewing whether the photographs are cumulative, we use an abuse of discretion standard of review. *Torres*, 280 Kan. at 327 (citing *State v. Parker*, 277 Kan. 838, 847, 89 P.3d 622 [2004]). There, we observed that the admission of photographs in a murder case has rarely been held to be an abuse of discretion. 280 Kan. at 327 (citing *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 [2001]).

As noted, Exhibit 54 is a close-up of the victim's face, and Exhibit 58 depicts him lying shirtless on the autopsy table exposing two gunshot wounds on the left side of his chest. The former was used to identify the shooting victim. The latter was used to show the bullet wounds, *i.e.*, to explain the cause of death, which this court has routinely approved in conjunction with coroner testimony. See, *e.g.*, *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001); *State v. White & Stewart*, 225 Kan. 87, 91, 587 P.2d 1259 (1978).

The district court did not abuse its discretion in admitting them into evidence.

Issue 4: *Did the district court err in determining that Giang's convictions of felony murder and aggravated kidnapping are not multiplicitous?*

Giang argues that the charges of felony murder and aggravated kidnapping are multiplicitous because the same act of force was the basis for both convictions. He therefore asks that the case be remanded with instructions that the aggravated kidnapping charge be amended to simple kidnapping.

The State responds that there is no multiplicity problem because two shots were fired, one to Thang's back while he was standing upright and the other to his chest while he was on his knees or near the ground. The State contends that the chest shot occurred last and was the most lethal. The State also argues that if we find multiplicity, then this court has the authority to convict Giang of the lesser offense of kidnapping pursuant to *State v. Robbins*, 272 Kan. 158, 179, 32 P.3d 171 (2001).

The resolution of this issue is controlled by the analysis in *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), which confirmed our prior approach to the issue of multiplicity when a defendant has been convicted of both felony murder and the underlying felony. Specifically, *Schoonover* recognized that a legislature could authorize cumulative punishments under felony murder and underlying felony statutes. Slip op. at 43-44 (citing *Missouri v. Hunter*, 459 U.S. 359, 368-69, 74 L. Ed. 2d 535, 103 S. Ct. 673 [1983]). Moreover, *Schoonover* concluded that through K.S.A. 21-3436, the inherently dangerous felony statute, "the legislature stated its intent as to when cumulative punishments can be imposed." Slip op. at 33. Because K.S.A. 2002 Supp. 21-3436(a)(2) lists aggravated kidnapping as an inherently dangerous felony, Giang may be punished cumulatively for felony murder and aggravated kidnapping. Accordingly, convictions of felony murder and aggravated kidnapping are not multiplicitous. See *State v. Sutton*, 256 Kan. 913, 889 P.2d 755 (1995); *State v. Pioletti*, 246 Kan. 49, 785 P.2d 963 (1990); *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988). Giang's argument has no merit.

Issue 5: *Were Giang's rights of confrontation violated when the district court admitted his own statements into evidence?*

Finally, Giang complains that his right to confront witnesses against himself under the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights was violated when the State presented the jury with evidence of his statements to the Garden City detectives. As in issue one, Giang relies heavily on *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), as support for his argument. As noted in issue one, in *Crawford* the Court held that testimonial statements of unavailable witnesses are inadmissible unless the defendant was afforded an opportunity to cross-examine those witnesses. Giang claims that *Crawford* applies also to statements made by a defendant to police.

Giang also claims that he is in a "catch-22" in that either he can forego his Fifth Amendment right and testify himself about the alleged statement, or he can exercise his Fifth Amendment right and allow the unchecked testimonial statements to enter into evidence. He argues that this dilemma is a violation of the doctrine of unconstitutional conditions, as illustrated by *Simmons v. United States*, 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968).

Giang's argument was not presented to the trial court, and no objection was made when the statements were introduced into evidence. Generally, where constitutional grounds are asserted for the first time on appeal, they are not properly before this court for review. *State v. Denney*, 278 Kan. 643, 651, 101 P.3d 1257 (2004). Additionally, a timely and specific objection for the admission of evidence is necessary to preserve the issue for appeal. *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001); see K.S.A. 60-404.

Moreover, we rejected this identical argument in *State v. Torres*, 280 Kan. 309, 121 P.3d 429 (2005), and *State v. Adams*, 280 Kan. 494, 124 P.3d 19 (2005). In *Torres* we stated:

"Torres' right against self-incrimination and his right to confront the witnesses against him are not conflicting. Torres was not compelled to disclose information to law enforcement, but he chose to do so. We are unaware of any authority holding that 'confronting oneself' at trial under these circumstances is a right guaranteed by the Sixth Amendment. Torres fails to show that his Sixth Amendment rights were violated." 280 Kan. at 318.

Similarly, Giang fails to show that his right of confrontation was violated.

The district court is affirmed.

LARSON, S.J., assigned.