No. 108,570

STATE OF KANSAS, *Appellee*, v. LUIS A. AGUIRRE, *Appellant*.

(349 P.3d 1245)

Opinion filed May 15, 2015.

*Debra J. Wilson,* of Capital Appeals and Conflicts Office, argued the cause and was on the brief for appellant.

*Natalie A. Chalmers,* assistant solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: A jury convicted Luis Aguirre of capital murder, based on his premeditated intentional killing of two persons: his ex-girlfriend and their 1-year-old son. During two separate interrogations by law enforcement officers, Aguirre made incriminating statements which he later unsuccessfully moved to suppress. On appeal, Aguirre contends that his confessions should have been suppressed for two reasons: (1) The interrogating officers refused to terminate the questioning when Aguirre invoked his rights under *Miranda v. Arizona,* 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); and (2) the officers' interrogation techniques rendered his confessions involuntary. In addition, Aguirre complains that the prosecutor misstated the law in closing argument with regard to the manner in which the jury is to consider lesser included offenses. Because the law enforcement officers refused to allow Aguirre to terminate the questioning, as he had been advised that he could, the district court erred in denying the sup-

pression of Aguirre's statements made after the *Miranda* violation. Accordingly, we reverse and remand for a new trial.

FACTUAL AND PROCEDURAL OVERVIEW

In 2007, while living in Chicago, Aguirre had a relationship with Tanya Maldonado, then age 16, with whom he fathered a child, Juan. Later, while going through National Guard training in Alabama, Aguirre began a relationship with a soldier, Dulce Mendez. By February 2009, Mendez was stationed at Fort Riley Military Reservation, and Aguirre moved in with Mendez and her son, David, in nearby Ogden, Kansas. Mendez was deployed to Iraq in August 2009, and, subsequently, Aguirre and David relocated to Austin, Texas, where Mendez' parents lived.

Notwithstanding his relationship with Mendez, Aguirre maintained email contact with Tanya after the birth of their son. By early 2009, Tanya began asking Aguirre for money and urging him to see his son and acknowledge paternity. Aguirre assured Tanya that he intended to provide for Juan, but by May, when Aguirre had not seen the child or paid any support, Tanya threatened to take legal action. Tanya's threats continued through July and August, culminating in her ultimatum that Aguirre had until September 20 to decide what he wanted to do.

Aguirre was in Chicago on September 19 and 20, 2009, for National Guard drills. Tanya and Juan had been living at a Chicago homeless shelter, but they left the shelter on September 20. Tanya had told her case manager that Juan's father, who was in the military, was coming to pick them up and take them to Texas to live as a family. She had also told the security guard that Juan's father was on his way, and the security guard said Tanya left with a young man driving a gray 4-door SUV. Mendez owned a tan Jeep Cherokee that she let Aguirre use.

The following month, on October 25, 2009, Tanya and Juan were found dead in a shallow grave in a remote area near Ogden. The pathologist would testify that he could not determine the cause of death, although both bodies displayed injuries consistent with the application of force from either a major fall or something striking the victims. An expert would testify that an analysis of the vege-

tation indicated the grave had been dug approximately 4 to 6 weeks prior to its discovery and that the stacking of leaves under the bodies indicated the grave had been open for a period of time, perhaps as much as a few days, before the bodies were deposited in it.

Because of Aguirre's relationship with the victims and his prior residency in Ogden, the Riley County investigating detectives traveled to Austin to interview Aguirre on October 30, 2009. When arranging the interview, the detectives did not reveal that they knew that Tanya and Juan were dead but rather they told Aguirre that they were trying to locate Tanya. Aguirre voluntarily met with the police.

At first, Aguirre said he had not seen Tanya in months and that she had talked of moving to California. After the detectives said they knew Tanya had been in Kansas, Aguirre said that she had been to the door of his apartment accompanied by an unknown man on or about September 17, 2009. When the detectives revealed that they knew that Tanya was dead, Aguirre admitted that he was involved. But he related various versions of what transpired, indicating that Tanya's death was either accidental or caused by Aguirre in self-defense. Likewise, he gave multiple descriptions of how Juan died accidentally. Ultimately, Aguirre wrote a statement of the events that he said had occurred on September 17, reiterating that he did not mean to kill either Tanya or Juan. After taking the written statement, the detectives arrested Aguirre.

On November 3, before Aguirre was returned to Kansas, the detectives contacted Aguirre at the jail, advising him they had additional questions. They transported him to the police department, had him read his *Miranda* rights aloud, and began the interview by saying they knew Aguirre had been in Chicago on September 19 for a National Guard drill. Eventually, Aguirre admitted that he had picked up Tanya and Juan at the shelter on September 20 and that they had driven to Kansas, arriving in Ogden the afternoon of September 21. He said the deaths occurred that evening, again describing scenarios in which the deaths were accidental.

The State tried Aguirre for capital murder and sought the death penalty. As part of its case-in-chief, the State presented video re-

cordings of the detectives' two interrogations of Aguirre. It also admitted emails sent by Aguirre to Tanya's address after the deaths, purporting to inquire about her future plans for herself and Juan. The medical examiner testified that the victims' injuries were not consistent with Aguirre's accidental death scenarios and that the chances of Tanya and Juan simultaneously dying accidentally were "vanishingly small." Aguirre did not testify or present any evidence in his defense.

The jury convicted Aguirre of capital murder but did not impose the death penalty. The court sentenced Aguirre to a life sentence without the possibility of parole, and he timely appealed directly to this court. See K.S.A. 2014 Supp. 22-3601(b)(3) (direct appeal to Supreme Court where maximum sentence of life imprisonment has been imposed for murder).

## INVOCATION OF *MIRANDA* RIGHTS

The rules governing an accused's constitutional rights during a custodial interrogation are well established: "The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent." *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003) (citing *Miranda*, 384 U.S. at 479). Moreover, in Kansas, "[n]o person shall be a witness against himself [or herself]." Kan. Const. Bill of Rights, § 10. "[A] suspect's invocation of his or her right to remain silent must be scrupulously honored and cuts off further interrogation elicited by express questioning or its functional equivalent." *State v. Scott*, 286 Kan. 54, 69-70, 183 P.3d 801 (2008) (citing *State v. Carty*, 231 Kan. 282, 286, 644 P.2d 407 [1982]).

Aguirre's first challenge to the admissibility of his interrogation statements is his contention that the detectives conducting the questioning failed and refused to honor his invocation of his *Miranda* rights during the first interrogation, which constitutional violation also tainted his statements during the second interview. When reviewing a district court's decision on a motion to suppress, we bifurcate our analysis, first assessing whether the factual findings below are supported by substantial competent evidence and

then applying a de novo standard to the ultimate legal conclusion to be drawn from those facts. *State v. Sanchez-Loredo*, 294 Kan. 50, 54, 272 P.3d 34 (2012).

*First Interview*

Our resolution of this issue will initially turn upon the clarity with which Aguirre communicated to the interrogating officers that he was invoking his rights during the first interrogation, after he had initially waived them orally and in writing. Accordingly, we need to look at what Aguirre said and the context in which he said it.

As noted above, the interrogation began under the guise that the officers were simply trying to locate Tanya. But the questioning intensified as the detectives began refuting Aguirre's answers, becoming especially aggressive after the detectives confronted Aguirre with their knowledge that Tanya was dead. The interrogators told Aguirre that they knew he was lying about having no knowledge of Tanya's death and that lying would make him look worse than if he told the truth. They fed Aguirre the suggestion that Tanya's death might have been accidental, that Aguirre was probably bothered by the knowledge of what happened, and that it was time for Aguirre "to let it off [his] shoulders." They also used the tack of urging Aguirre to tell what happened so Tanya's family could find some peace. Then, the following exchange occurred, with emphasis added to the portions relevant to this issue:

"DETECTIVE RUNYAN: It's okay, Luis.

"DETECTIVE LEWIS: Come on. Seriously man.

"DETECTIVE RUNYAN: I know it's tough. I'm listening.

"MR. AGUIRRE: *I'm in a proposition right now though. I want to go and turn in David to his family and then I will be here as long as you want me to afterwards.*

"DETECTIVE LEWIS: Well okay. We can help you take care of David and help you get him to his family.

"DETECTIVE RUNYAN: Let me just ask you this. Let me just ask you this. Could it have been like an accident? Was that possible? I'm trying to understand it. Because the intent is the whole deal here.

"MR. AGUIRRE: *This is—I guess where I, I'm going to take my rights and I want to turn in David to his family and I'll be back here. I mean, I would like to keep helping you guys I just want to—*

"DETECTIVE RUNYAN: Okay. We do appreciate that help. But I'm going to have to explain a few things to you first. We also have some search warrants. We have a search warrant for your DNA. Okay. And for a scent. And we also have a search warrant for the Cherokee. And the Cherokee is coming back with us to Kansas. And we've also got a search warrant for the trailer. So I don't know if they are out there searching right now. But we do have search warrants signed by a judge. And I believe they've already called the family of David. And that's already been taken care of. Now I don't think you're going home. But I think there is probably something there that we need to just understand so maybe it's not as bad as what it looks. That's why I'm here. Because if it's not as bad as it looks, then, you know—

"DETECTIVE LEWIS: And maybe we can help you explain things. If this was an accident, maybe she went ballistic when things got there and things got out of hand and you didn't mean for this to happen, but it still happened. That's what we need to know. But you got to be willing to talk with us and explain to us what happened.

"DETECTIVE RUNYAN: The day you left—

"DETECTIVE LEWIS: Are you willing to do that for us, Luis? Do you not want to look at that picture (indicating)?

"MR. AGUIRRE: (Shakes head from side to side.)

"DETECTIVE LEWIS: Okay. Are you willing to help us figure this out, Luis?

"DETECTIVE RUNYAN: Maybe it's just not as bad as it looks.

"DETECTIVE LEWIS: And explain it?

"DETECTIVE RUNYAN: I'll be back.

"DETECTIVE LEWIS: Luis, I know this is tough. Okay? All right. Are you still wanting to help us on this thing?

"MR. AGUIRRE: (Nods head up and down.)

"DETECTIVE LEWIS: Yeah? Can I hear a yes?

"MR. AGUIRRE: Yes."

Aguirre contends that when he said that he was going to take his rights and leave with David, the detectives were required to terminate the interrogation and the district court should have suppressed everything that Aguirre said after invoking his rights. The argument is founded upon a long-standing rule of law: If a suspect invokes the right to remain silent during questioning, that interrogation must cease. *Michigan v. Mosley*, 423 U.S. 96, 100, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (quoting *Miranda*, 384 U.S. at 473-74). Thereafter, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Mosley*, 423 U.S. at 104.

More recently, law enforcement's duty to scrupulously honor a suspect's decision to invoke his or her *Miranda* rights has been conditioned upon the suspect's ability to communicate that decision without any ambiguity or equivocation. See *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (suppression only required for denial of unambiguous invocation of *Miranda* rights; objective inquiry). This court has said that we test the clarity of a *Miranda* rights invocation by determining whether a reasonable police officer under the circumstances would understand the suspect's statement as an assertion of a *Miranda* right. *State v. Cline*, 295 Kan. 104, 113, 283 P.3d 194 (2012).

Notwithstanding that rather straightforward, objective test, we must recognize that, in some of our prior cases, this court discerned an ambiguity that was not immediately apparent from the language employed by the suspect. See, *e.g.*, *State v. Kleypas*, 272 Kan. 894, 924, 40 P.3d 139 (2001) (" 'I think that might be all for you' " found ambiguous); *State v. McCorkendale*, 267 Kan. 263, 273, 979 P.2d 1239 (1999) (" '[s]o that's all I [got] to say' " found ambiguous); *State v. Fritschen*, 247 Kan. 592, 606-07, 802 P.2d 558 (1990) (" 'I don't want to talk about it any more, it hurts too much' " found not to rise to the level of ambiguity that would require officer inquiry before continued questioning). Also, *State v. Holmes*, 278 Kan. 603, 619, 102 P.3d 406 (2004), found fatal equivocation in the statement, " 'I think I'll just quit talking, I don't know.' " And, more directly applicable to this case, *State v. Scott*, 286 Kan. 54, 71, 183 P.3d 801 (2008), found that the suspect's request to finish the interview the next morning was not an invocation of his rights because he indicated a willingness to talk with police later.

While those prior cases are difficult to synthesize, one potential common coloring fact is that the suspect continued to answer questions after the alleged rights invocation, as occurred here. The trial court in this case stated that it was partially influenced by Aguirre's responses to the detectives' post-invocation questions in which he said he was still willing to talk to them. But the United States Supreme Court has held "that, under the clear logical force of settled precedent, an accused's *postrequest* responses to further

interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). In other words, if the interrogators simply ignore the suspect's invocation of rights and continue to ask questions, the suspect's compliance with the further questioning does not invalidate or render equivocal the prior invocation of rights.

Accordingly, we need to assess what a reasonable law enforcement officer under the circumstances would have understood Aguirre's statement to mean at the time it was made. To put the statement—"I'm going to take my rights"—into perspective for a rational interrogator, we should look at what that interrogator had advised the suspect about his rights. The record on appeal includes the form which the detectives used to advise Aguirre of his *Miranda* rights and to memorialize Aguirre's written waiver of those rights. One of the detectives directed Aguirre to read his *Miranda* rights out loud from the form, which reading is transcribed in the appellate record as follows:

"MR. AGUIRRE: Advise [sic] of rights, your rights. Before we ask you any questions you must understand—you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford to hire a lawyer one will be appointed to represent you free of charge before any questioning if you wish. If you decide to answer questions now without a lawyer present you will have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

That recitation tracked the language on the form, entitled "Advice of Rights" and subtitled "Your Rights." Following the six statements of rights that Aguirre read aloud, the form contains a "Waiver of Rights" statement to be signed by the suspect. The first sentence of the waiver statement reads, with emphasis added: "I have read this statement of *my rights* and I understand what *my rights* are." In other words, the form the detectives used to obtain Aguirre's waiver of his *Miranda* rights directed him to refer to them as "my rights."

Consequently, when Aguirre said that "[t]his is—I guess where I, I'm going to take my rights," it would have been objectively unreasonable for the detectives not to understand that the "my rights" Aguirre invoked during questioning were the same as the "my rights" that Aguirre had waived in writing at the detectives' specific request before questioning. Certainly, if a suspect's waiver of "my rights" is sufficient to be a knowing and voluntary waiver of his or her *Miranda* rights, then the taking of "my rights" must be a sufficient invocation of those same rights. That correlation is particularly important because the waiver of rights form specifically informed Aguirre that even if he initially chose to answer questions without a lawyer present, he would retain "the right to stop answering at any time," which is precisely what he attempted to do.

Moreover, the rights advisory did not inform Aguirre that he had to proffer, or even have, any particular reason for wanting to stop answering questions. So, the fact that Aguirre said that he wanted to stop answering questions in order to take a child to his family, rather than saying that he wanted to stop answering questions to invoke his right to remain silent, does not alter the fact that he was invoking the explicit, written right to "stop answering at any time."

Likewise, the *Miranda* rights advisory form did not say that a suspect could only stop answering questions if he or she intended to remain silent forever and never resume answering questions. In fact, the last sentence of the advisory belies the notion that a temporary cessation of answering is not permissible. That advisory says that the suspect "also [has] the right to stop answering at any time until *you talk to a lawyer*." (Emphasis added.) That advisory suggests that the answering might resume after the suspect talks to a lawyer. Accordingly, the interrogators should not have been befuddled by Aguirre's stated intention to help them out later because an intention to talk later would not preclude the right to stop answering now.

Moreover, the district court's finding of equivocation in Aguirre's use of the words, "I guess," takes that language out of context. Aguirre first tried to stop the questioning with the following statement: "I want to go and turn in David to his family and then I will be here as long as you want me to afterwards." But the

detectives brushed aside that request, with one detective saying they could help Aguirre get David to his family, while the other detective continued to try to extract an inculpatory statement from Aguirre. Apparently realizing that he had to be more explicit with the detectives, Aguirre clarified what he wanted to do by saying: "This is—I guess where I, I'm going to take my rights and I want to turn in David to his family and I'll be back here. I mean, I would like to keep helping you guys I just want to—." At most, the "I guess" could be read as an uncertainty about the manner by which he could invoke his rights, rather than any equivocation about whether he really wanted to stop answering questions. In context, the statement was a second, consecutive request to leave the interrogation, utilizing the exact language employed by the detectives when they obtained the original waiver.

Further, Aguirre's contemporaneous statements about coming back later to continue the questioning should have reinforced, rather than negated, the notion that his intent was to stop answering questions now. How could he come back later to help the detectives without first invoking his right to stop answering questions? Moreover, *Smith* instructs us that the one detective's post-request statement—"Now I don't think you're going home"—cannot cast any retrospective doubt on the clarity of Aguirre's actual request to take his rights. See 469 U.S. at 100.

In *Anderson v. Terhune*, 516 F.3d 781, 787 (9th Cir. 2008), the Ninth Circuit Court of Appeals held that the defendant's declaration, " 'I plead the Fifth,' " was facially unambiguous. Given the rights waiver form utilized here, the statement, "I'm going to take my rights," is just as facially unambiguous. Adding the context in which the statement was made, especially Aguirre's immediately preceding statement that he wanted to leave, makes it crystal clear that Aguirre was attempting to stop answering questions and leave the interrogation. This was not a case in which the interrogators had to guess at what the suspect really wanted to do. Rather, it was a case where the interrogators simply refused to scrupulously honor the suspect's right to cut-off questioning but instead coerced the suspect to continue the interrogation until they had the confession they sought. Although that tack was effective, it was anathema to

the *Miranda* rights. Consequently, all of Aguirre's statements in the first interview after he invoked his *Miranda* rights should have been suppressed. See *United States v. Rambo*, 365 F.3d 906, 911 (10th Cir. 2004)· (confession suppressed where police failed to cease questioning after suspect invoked rights).

*Second Interview*

The State argues that, even if Aguirre's post-invocation statements in the first interview should have been suppressed, that error would be rendered harmless by Aguirre's admissions during the second interview. In that subsequent interview, Aguirre said the deaths were accidental, but he described how he had disposed of the victims' bodies and he admitted driving them from Chicago to Ogden.

The State acknowledges that constitutional violations during the first interview can taint the evidence obtained in a subsequent interview, citing to *State v. Swanigan*, 279. Kan. 18, 44, 106 P.3d 39 (2005). *Swanigan* involved the somewhat different issue of whether law enforcement's coercion of an involuntary statement in the first interrogation tainted the voluntary statements obtained in a subsequent interrogation. Here, the question is whether the police could obtain a valid *Miranda* rights waiver at a subsequent interrogation after refusing to honor an invocation of those rights at the first interview. Under that circumstance, the police were constrained, if not prohibited, from reinitiating questioning.

In *State v. Matson*, 260 Kan. 366, 374, 921 P.2d 790 (1996), this court said that the validity of a *Miranda* waiver, after a suspect has previously invoked those rights, depends on whether "the accused (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right." See also *State v. Mattox*, 280 Kan. 473, 481, 124 P.3d 6 (2005) (quoting same two-step analysis to determine whether accused waived previously asserted right). The State failed the *Matson* test by reinitiating the second interrogation.

Consequently, the taint of the *Miranda* rights violation in the first interview was not sufficiently attenuated to validate the rights waiver for the second interview, and the statements obtained in

the second interview should have been suppressed, as well. Accordingly, a harmless error analysis cannot take into consideration any of Aguirre's statements after he invoked his *Miranda* rights during the first interview.

*Harmless Error*

*Swanigan* clarified that the harmless error rule applies to the erroneous admission of an involuntary confession. 279 Kan. at 45. That decision was based upon *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), which held that error admitting a defendant's statements that were taken in violation of *Miranda* was subject to harmless error review. Accordingly, we will proceed to determine whether the erroneous admission of Aguirre's confessions requires reversal.

This court's most recent iteration of the test for determining whether error violating a defendant's constitutional rights is harmless requires that the State carry the burden of proving "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). In this case, the State is simply unable to clear that high bar.

Granted, without Aguirre's statements, there was still circumstantial evidence presented that would point to a number of suspicious coincidences. For instance: Aguirre fathered Juan with Tanya, who became increasingly demanding about paternity acknowledgement and child support, setting a September 20 deadline; Aguirre was in Chicago on September 20, the day Juan and Tanya left the shelter; Aguirre had the use of a tan Jeep Cherokee, while the security guard saw the victims leave in a gray 4-door SUV; Juan and Tanya were buried outside Ogden, less than 2 miles from Aguirre's residence at the time, in a grave that had been dug beforehand; 7 months before Tanya left the shelter, Aguirre sent her an email describing his thoughts about killing her; and before invoking his *Miranda* rights, Aguirre gave the detectives contradictory information. We have repeatedly declared that the law clearly

allows a conviction of even the gravest offense to be based on circumstantial evidence. See *Ward*, 292 Kan. at 581. In that vein, if the district court had suppressed the unconstitutionally obtained confessions and the jury had convicted Aguirre on what remained of the State's case, this court very well may have found that the evidence was sufficient for a rational jury to find Aguirre guilty. But just because the State might show that a jury could have convicted Aguirre on the remaining evidence does not mean that it has proved harmlessness beyond a reasonable doubt, *i.e.*, there is no reasonable possibility the error affected the verdict.

Pointedly, the State presented no nonconfession evidence—physical or otherwise—that established that the victims had ever been in Aguirre's Ogden apartment, much less that he killed them. And on the flip side, the defendant's admitting to being involved in the victims' deaths and to burying them in the predug graves was compelling evidence that carried at least a reasonable possibility of affecting the jury's verdict.

In short, under the standard applicable here, the State has failed to carry its burden to show that the erroneous admission of defendant's unconstitutionally obtained confessions was harmless. We must reverse and remand for a new trial.

Given our holding on this issue, we need not analyze Aguirre's claim that his confessions were involuntary or that the prosecutor committed error during closing argument.

Reversed and remanded for a new trial.

MICHAEL J. MALONE, Senior Judge, assigned.

\* \* \*

BILES, J., dissenting: I disagree with the majority's holding that Aguirre unambiguously invoked his right to remain silent. The majority finds an unambiguous invocation in Aguirre's statement:

"This is—I guess where I, I'm going to take my rights and I want to turn in David to his family and I'll be back here. I mean, I would like to keep helping you guys I just want to—." The majority's conclusion deviates from our caselaw and ignores the full context of what was happening during the questioning at issue.

To begin with, the majority overlooks that when Aguirre voluntarily came to the Austin Police Department for his interview with the investigating Kansas detectives, he brought David, the young son of Dulce Mendez, with him. David remained in a separate room with an Austin Police Department employee while Aguirre was interviewed. This explains why Aguirre initially said in the quoted portion of his interview, "I want to go turn in David to his family and then I will be here as long as you want me to afterwards."

To me, this additional context, coupled with Aguirre's initial statement, clarify why the detectives could easily understand Aguirre's second statement: "This is—I guess where I, I'm going to take my rights and I want to turn in David to his family and I'll be back here. I mean, I would like to keep helping you guys I just want to—," was a concern for David and an expression of continued cooperation with law enforcement and not a clear, unequivocal, and unambiguous assertion of *Miranda* rights. In other words, the detectives reasonably could ask follow up questions to clarify what Aguirre meant; and when they did, he explained more than once that he was willing to keep talking to them but needed to make sure David was alright.

Police are free to question a suspect who is in custody when the suspect has waived his or her *Miranda* rights. See *Davis v. United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). If the suspect invokes *Miranda* during questioning, the interrogation must end. See *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (right to remain silent); *Davis*, 512 U.S. at 458 (right to counsel). No one disagrees about these bedrock principles. But our caselaw requires the invocation to be unambiguous, such that a reasonable police officer under the circumstances would understand the statement as an assertion of a *Miranda* right. See *State v. Cline*, 295 Kan. 104, 113,

283 P.3d 194 (2012) (reviewing trial court's conclusion statement freely, voluntarily, and intelligently made); see also *Thompkins*, 560 U.S. at 381.

"A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity. [Citation omitted.] *If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' [Citation omitted.] Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity.* [Citations omitted.] Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights 'might add marginally to *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation.' [Citation omitted.] But 'as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.' [Citations omitted.]" (Emphasis added.) *Thompkins*, 560 U.S. at 381-82.

In determining whether an alleged invocation is clear and unambiguous, the court may examine the invocation itself and the defendant's statements prior to the invocation. *Cline*, 295 Kan. at 114; *State v Appleby*, 289 Kan. 1017, 1051, 221 P.3d 525 (2009) (recognizing timing, content, and context of reference to counsel may aid in determining whether alleged invocation was unambiguous assertion of Fifth Amendment right to counsel); see also *Thompkins*, 560 U.S. 381 (no reason to adopt different standards for determining when accused has invoked right to silence as opposed to right to counsel).

Our focus in deciding whether Aguirre clearly and unambiguously invoked the right to remain silent must be on the alleged invocation itself and the circumstances leading up to it. See *Cline*, 295 Kan. at 114; *Appleby*, 289 Kan. at 1051. This court has examined on several occasions whether a suspect's statements were unambiguous assertions of the right to remain silent.

For instance, the statement " 'I think I'll just quit talking, I don't know' " was held to be ambiguous because it could be construed to mean the suspect simply did not want to talk about details of a shooting at that precise moment in the interview but did not know

if he should. *State v. Holmes*, 278 Kan. 603, 619, 102 P.3d 406 (2004). Similarly, the phrase " 'I think that might be all for you' " was ambiguous as to whether the defendant desired to end the interview. *State v. Kleypas*, 272 Kan. 894, 924, 40 P.3d 139 (2001). And the declaration " '[s]o that's all I [got] to say' " was ambiguous because it could be interpreted to mean the defendant had simply finished his answer to the previous question. *State v. Mc-Corkendale*, 267 Kan. 263, 273, 979 P.2d 1239 (1999). Similarly, the phrase " 'I don't want to talk about it anymore, it hurts too much' " uttered while the suspect was being questioned about his involvement in two murders "d[id] not even reach the level of a potentially ambiguous request to remain silent; [the suspect] was saying he was upset and having difficulty talking." *State v. Fritschen*, 247 Kan. 592, 606-07, 802 P.2d 558 (1990).

Perhaps most similar to Aguirre's case is *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008), in which detectives questioned a capital murder defendant about his involvement in a home invasion during which two occupants died. After the defendant admitted being in the house, the detectives pressed for more details, and the defendant said, " 'Can we finish this in the morning, man? Please?' " As detectives continued the questioning, defendant repeated, " '[L]et's finish this in the morning, man, I. Let's finish this in the morning.' " 286 Kan. at 69.

The *Scott* court held the request was not an unequivocal invocation of the right to remain silent, reasoning that the defendant "never stated he did not wish to talk; he simply indicated a desire to finish his statement the next morning." 286 Kan. at 71. The court also noted an interviewing detective testified he believed the defendant made the request because he was getting emotional and embarrassed but seemed to be in control and proceeded to tell the interviewers what had happened. 286 Kan. at 70. And it distinguished the defendant's request to continue the interview later from similar requests in other cases in which it was held an invocation of the right to remain silent had occurred; namely, cases in which suspects explicitly told police they did not wish to talk at the time but said they might or would talk later. 286 Kan. at 71.

The majority mistakenly relies on *Anderson v. Terhune*, 516 F.3d 781, 787 (9th Cir. 2008), in which officers continued questioning after the defendant said, " 'I plead the Fifth,' " in conjunction with other statements that he was through with questioning and wanted to be taken into custody. The United States Court of Appeals for the Ninth Circuit held the phrase " 'I plead the Fifth' " is a facially unambiguous invocation of *Miranda* rights. 516 F.3d at 787. It also noted the context in which those words were said—among defendant's other statements that signaled his intent to end the questioning—indicated defendant's clear desire not to talk anymore. The court further observed that defendant did not equivocate his invocation with words like " 'maybe,' " " 'might,' " or " 'I think.' " 516 F.3d at 787-88. Similarly, the majority's reference to *United States v. Rambo*, 365 F.3d 906 (10th Cir. 2004), is misplaced because when the suspect was asked by the investigator, " 'Do you want to talk to me about this stuff?' " the suspect flatly stated, " 'No.' " 365 F.3d at 908.

Aguirre's case is distinguishable because he did equivocate, saying he "guess[ed]" he was going to "take [his] rights," and made the statement in conjunction with others indicating he desired to continue the questioning. Like the defendant's statements in *Scott*, Aguirre's statement and the circumstances surrounding it suggest Aguirre, as he said, simply wanted "to go and turn in David to his family" and not end the questioning. Aguirre did not tell the detectives he did not wish to talk to them at that time; to the contrary, he represented he wanted to continue the interview and would but for his need to attend to David. The stated purpose for the requested delay (childcare) was unrelated to Aguirre's right to remain silent under the Fifth Amendment to the United States Constitution.

Under our caselaw, Aguirre's statement was not an unambiguous, unequivocal invocation of his right to remain silent. I would hold the district court did not err in refusing to suppress Aguirre's subsequent admissions. Given Aguirre's internally inconsistent statement about "tak[ing] my rights" and wanting to "keep helping" the officers, the officers quite reasonably followed up to determine whether Aguirre's concerns had to do with David or whether he

intended to invoke the right to remain silent. See *Scott*, 286 Kan. at 69-70 (when suspect's statement is ambiguous as to whether suspect is asserting right to remain silent, interrogator may ask questions to clarify). When they did follow up, Aguirre notably indicated more than once he was willing to continue talking to the detectives, which he did.

NUSS, C.J., and ROSEN, J., join in the foregoing dissenting opinion.