NOT DESIGNATED FOR PUBLICATION

No. 115,609

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY STEPHEN NICHOLS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed June 16, 2017. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Barry K. Disney*, senior deputy county attorney, *Barry Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., HILL and SCHROEDER, JJ.

*Per Curiam*:  The issues raised in this appeal focus on the search of Anthony Stephen Nichols' cell phone and the admissibility of his statements to the police. The police search was conducted according to a clearly worded search warrant and was proper. Even though the two police interviews were several hours apart, Nichols' statements were voluntary and admissible. Serving a 51-year sentence for attempted first-degree murder, Nichols asks us to overturn his conviction. Our review of the record reveals no errors and we affirm Nichols' conviction.

1

*The police questioned Nichols after two men were shot and killed.*

John Burroughs was found dead in his home in Manhattan, Kansas, in September 2013. Burroughs had suffered multiple stab wounds to his chest and neck and a gunshot wound in the right side of his face. The next day, Junction City police responded to a report of a gunshot. At that scene, they found Anthony Nixon dead from a gunshot wound to his head. For various reasons, the investigation focused on Nichols as the killer of both Burroughs and Nixon. About 4 days later, the police arrested Nichols in Kansas City, Kansas.

The officers took Nichols to a police station in Wyandotte County. Police Officer Patricia Giordano and Detective Brek Jager began interviewing Nichols. At the start of the interview Nichols said he knew his rights and recited them from memory. He was read his *Miranda* rights anyway and filled out a waiver-of-rights form. The interview began at 11:20 a.m. Around 1 p.m. the police obtained a search warrant for Nichols' apartment, cell phone, and the contents of the cell phone. Officer Giordano told Nichols the officers were going to search the home and asked to continue talking with Nichols after the search. While the officers searched, another officer transported Nichols to Junction City.

During the search of Nichols' apartment the police discovered a gun which would later be identified as the gun that shot Burroughs. Several cell phones were also recovered. A later search of the contents of the cell phone revealed two potentially incriminating messages. At the conclusion of the search Officer Giordano returned to Junction City to interview Nichols.

Officer Giordano and Detective Josh Brown conducted the interview in Junction City. Officer Giordano began the Junction City interview by reminding Nichols that she told him she would return to talk with him. Nichols appeared alert, conscious, and

capable of making rational decisions. Giordano did not ask and Nichols did not specifically waive his *Miranda* rights at the beginning of this interview. The officers questioned Nichols about the gun that was found at his residence. Nichols admitted that it was the murder weapon and that he had possessed the weapon. Officer Brown inquired further into how Nichols came to possess the gun and Nichols responded, "I don't want to talk about it now." After this statement, the police questioning continued along other lines of inquiry.

The State charged Nichols with the premeditated first-degree murder of Burroughs. Two pretrial motions are relevant to this appeal: a motion to suppress Nichols' statements and a motion to suppress the search of the contents of Nichols' cell phone.

At the hearing on his motion to suppress his statements, Nichols argued:

- He did not voluntarily waive his *Miranda* rights at the first interview;
- the statements made at the Junction City interview were involuntary because he did not waive his *Miranda* rights; and
- his statement of "I don't want to talk about it now" was an invocation of his right to remain silent and statements after that point were inadmissible.

*The district court denied both motions.*

In denying the motion to suppress Nichols' statements, the court found that Nichols had shown he understood his rights by reciting them from memory as Officer Giordano read the rights aloud. In the court's view, Nichols' recitation showed that he was in such a condition that his waiver was voluntary.

3

The district court also decided that a second waiver was not necessary because the rights waiver from the Kansas City interview applied to the Junction City interview, since it was basically a continuation of the Kansas City interview. Finally, the district court found the statement, "I don't want to talk about it now" was not an unambiguous invocation of the right to remain silent.

Next, concerning the search of Nichols' cell phone, he argued the search warrant was invalid. Specifically, Nichols argued the lack of a "search protocol" within the warrant showed probable cause did not exist to search the contents of the cell phone. No additional evidence was presented at the hearing. The district court simply found probable cause to search the contents of the cell phone existed based upon the affidavit in support of the search warrant. With such reasoning, the district court denied the motion to suppress the results of the search of Nichols' cell phone.

At the close of evidence at the trial, the State moved to amend the complaint from first-degree murder to attempted first-degree murder. The court granted the motion. Ultimately, the jury found Nichols guilty of attempted first-degree murder.

*We find no impropriety in the search of Nichols' cell phone.*

Nichols' argument on this point is not a model of clarity. To the trial court, he contended the results of the cell phone search should be suppressed because the search warrant had no "search protocol." We take that to mean the warrant did not specifically describe what portion of the cell phone would be searched and how it was to be searched. At the motion hearing, Nichols referred to an example from federal court as an illustration of his point. But to us, Nichols contends that the search warrant did not permit the search of the digital contents of his cell phone.

4

Nichols' entire argument can be summarized by his statement: "Nothing in the original warrant, authorizing a search of Mr. Nichols' apartment, authorized a search of the <u>digital</u> <u>contents</u> of the cellphone."

Our review of the record reveals that this assertion is false. The warrant specifically permits the search of:

> "Electronic devices capable of transmitting electronic data, media, or other information, and *the information contained therein*, including, but not limited to: Call logs, to include incoming, outgoing and missed calls, Phonebook and contacts to include phone numbers, and e-mail addresses SMS (Text) / MMS (Multimedia) messages and attached multimedia files, to include incoming and outgoing[.]" (Emphasis added.)

The emphasized language from the search warrant, which authorized the search of Nichols' apartment and the seizure of Nichols' cell phone, clearly permitted a search of the cell phone's contents.

The district court found the affidavit attached to the warrant supported probable cause to search the contents of the cell phone. Nichols does not raise any argument against the court's determination of probable cause. We must point out that an issue not raised before this court is deemed abandoned. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016). Thus, Nichols has abandoned any argument concerning the district court's determination of probable cause.

In our view, the search of Nichols' cell phone and the later admission of the contents into evidence was proper. We see no error here.

*The trial court properly admitted Nichols' statements to the police.*


On appeal, Nichols primarily argues about his invocation of the right to remain silent. But he also touches on the need for a second waiver of his rights before the police interview in Junction City. On the issue of the waiver from the first interview, Nichols only provides brief, conclusory statements.


Therefore, we hold that Nichols has waived any issue about his initial *Miranda* rights waiver. The failure to support an argument with adequate authority or, in the absence of authority, reasons why the position is correct is akin to failure to brief an issue. *State v. Murray*, 302 Kan. 478, 486, 353 P.3d 1158 (2015). Here, Nichols has not supported any argument concerning the initial *Miranda* waiver with any pertinent authority. Therefore, that part of the issue is waived.


Turning to the suppression of his statements made to the police in Junction City, we will review the district court's factual findings for substantial competent evidence and the ultimate legal conclusion will be reviewed de novo. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2015).


Nichols argues that because Officer Giordano did not obtain a waiver of Nichols' rights under the Fifth Amendment to the United States Constitution at the Junction City interview, those statements are inadmissible. A brief review of the law is helpful at this point.


The Kansas Supreme Court has held that after a voluntary waiver of rights has occurred there is no automatic requirement to repeat the *Miranda* warnings at successive interviews. *State v. Boyle*, 207 Kan. 833, 841, 486 P.2d 849 (1971). The district court here found the waiver at the Kansas City interview was voluntary, and Nichols has really not challenged that finding on appeal. Whether a second waiver is required at a

6

successive interview is based on the specific circumstances. *State v. Bridges*, 297 Kan. 989, 1003-04, 306 P.3d 244 (2013). We review the relevant factors here.

Factors that have been considered in determining whether additional waivers are required are: the passage of time between interviews; whether the suspect was in police custody the entire time; whether anything affected the suspect's understanding of his or her rights in the intervening period; and whether the same persons were conducting both interviews. See *State v. Nguyen*, 281 Kan. 702, 724, 133 P.3d 1259 (2006); *State v. Davis*, 268 Kan. 661, 678, 998 P.3d 1127 (2000).

The factual findings of the district court are not in dispute and are supported by substantial competent evidence. Officer Giordano ended the Kansas City interview by asking Nichols to talk with him at the conclusion of the search. Nichols was transported to Junction City. Approximately 6 hours and 50 minutes after the Kansas City interview ended, Officer Giordano and Detective Brown began the Junction City interview without obtaining a second *Miranda* rights waiver.

Primarily, Nichols relies on the length of time that passed between the conclusion of the Kansas City interview and the beginning of the Junction City interview to show a second waiver was required. Even though the appellate briefs contend a different amount of time passed, we have no doubt that a period of 6 1/2 hours, or a few minutes more, passed between the interviews. The record shows the Kansas City interview ended around 1 p.m. and the Junction City interview began between 7:45 p.m. and 7:50 p.m. on the same day.

Our research reveals that other courts have upheld the admission of statements without a second waiver where a similar amount of time passed between a first and second interview. See *State v. Mattox*, 280 Kan. 473, 491-92, 124 P.3d 6 (2005). In *Mattox*, a defendant was warned of his *Miranda* rights at 5:30 p.m. and waived those

rights at 7:30 p.m. Around 12:55 a.m., the police conducted a second interview with the defendant in which he gave a statement. The court held as a matter of law that a second waiver was not required based just upon the 5-1/2 hour gap between the waiver and the second interview. 280 Kan. at 491.

Other courts have held that gaps of time from a few minutes up to an entire day do not require a second waiver. See *Bridges*, 297 Kan. at 1003. In *Bridges*, only minutes passed between the interview including a waiver and a second waiver. In *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995), the court held: "Under the circumstances here, the one-day interval between *Miranda* warning and waiver and [defendant's] October 28 statement to [law enforcement] was not unreasonable." While time between the two interviews is something to consider in deciding whether a second waiver is required, there is no indication here that the almost 7-hour gap would require a second waiver. See *Mattox*, 280 Kan. at 491.

Other factors lead us to conclude that a second *Miranda* rights waiver was not necessary here because the second interview was a continuation of the first. We note that at the end of the Kansas City interview, Officer Giordano asked to return to talk with Nichols at the conclusion of the search. The Junction City interview began with Officer Giordano referring back to her statement about returning from the search. This shows clearly that the Junction City interview was simply a continuation of the Kansas City interview and not an entirely different custodial interview. Thus, the original waiver would attach to the second interview. See *Boyle*, 207 Kan. at 841.

The fact that at least one of the same officers, Officer Giordano, was present at both interviews also suggests that the interview was a continuation of the first interview. In *Davis*, 268 Kan. at 678, the court gave consideration to the fact that the confession was given during a juvenile detention center intake interview which was conducted by a different person than the police officer that initially obtained the *Miranda* waiver. The

8

confession was admissible, and the fact that a different person had conducted the interview did not require a second waiver. The holding in *Davis* shows a second waiver was not required here because Officer Giordano was present at both interviews, which would indicate the waiver from the first interview extended to the second interview. See 268 Kan. at 678.

While it is true that Nichols was in custody during both interviews, nothing in the record shows that Nichols' understanding of his rights changed during the time between the interviews. See *Nguyen*, 281 Kan. at 723.

We hold that the trial court drew the proper legal conclusion from its findings. Under *Boyle* and the cases which followed, in the absence of reasons to rule otherwise, there is no requirement to obtain a second *Miranda* waiver at successive interviews after an initial voluntary waiver had been obtained. See *Boyle*, 207 Kan. at 841. Nichols does not challenge the initial waiver on appeal. There was no need for the police to obtain a second waiver in this case, and the district court did not err by admitting Nichols' statements.

*We are not convinced Nichols invoked his right to silence.*

Nichols also challenges the admission of those statements that were given after what he argues was an invocation of his right to remain silent. When a person invokes his or her right to remain silent the police must scrupulously honor that request. *Michigan v. Mosely*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). But there must be a clear invocation of the right.

The law is well settled on this point. In order for questioning to immediately cease, the invocation of the right to remain silent must be unambiguous. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). The test to determine

9

whether a person has invoked his or her right to remain silent is whether a reasonable officer would believe a person has unambiguously invoked the right. *State v. Aguirre*, 301 Kan. 950, 957, 349 P.3d 1245 (2015).

The timing and context of the statement is important to the analysis. In *State v. Appleby*, 289 Kan. 1017, 1051, 221 P.3d 525 (2009), the court recognized that context is important in determining whether a statement is an unambiguous request for assistance of counsel. The United States Supreme Court, in *Thompkins*, 560 U.S. at 381, stated: "[T]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel."

Statements given after an alleged invocation cannot be considered in determining whether a person has invoked a right to silence. *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). In other words, the fact that a person continues to talk after potentially invoking the right to silence has no bearing on whether there is an unambiguous invocation of the right. *State v. Cline*, 295 Kan. 104, 114, 283 P.3d 194 (2012). We will now examine Nichols' claim of such an invocation here. Context is important.

Fairly early in the second interview, the officers told Nichols they had found a gun after searching his apartment. Shortly thereafter, the following exchange occurred:

"ANTHONY NICHOLS: I don't have no problems with [Anthony Nixon], I keep telling you that, I had no problem with Anthony.
"PATRICIA GIORDANO: Then why did he get shot?
"ANTHONY NICHOLS: I can't tell you that.
"PATRICIA GIORDANO: Then why do you have the murder weapon?
"ANTHONY NICHOLS: I have the murder weapon because I came back and got it.
"PATRICIA GIORDANO: Came from where to where?

10

"ANTHONY NICHOLS: I came back from Kansas City to get the fucking murder weapon.

"PATRICIA GIORDANO: From who?

"ANTHONY NICHOLS: I can't tell you that.

"JOSH BROWN: You knew it was a murder weapon when you picked it up?

"ANTHONY NICHOLS: Yes, I did. . . .

. . . .

"PATRICIA GIORDANO: I just want to hear your side of the story, don't you—

"ANTHONY NICHOLS: I did not shoot this man. Believe what you want.

"JOSH BROWN: What did you do?

"ANTHONY NICHOLS: I got the murder—

"JOSH BROWN: What did you do?

"ANTHONY NICHOLS: I went and got the fucking murder weapon.

"JOSH BROWN: Tell me—tell me how it played out.

"ANTHONY NICHOLS: I don't want to talk about it now.

"JOSH BROWN:  You don't have to give names. You don't have to give names.

"ANTHONY NICHOLS:  I came back here, I came back and got the mother fucking murder weapon after the mother fucker did it. I did see who did it, I was around there in the fucking area, true."

Officer Giordano testified that she did not believe that Nichols' statement "I don't want to talk about it now" was an invocation of his right to remain silent. The district court agreed with Officer Giordano and found that the statement was not an invocation of the right to remain silent. In the court's view, the statement was an answer to Officer Brown's request to discuss how Nichols obtained the murder weapon.

Clearly, there is no hesitancy in Nichols' answering the officer's questions after this. Based upon the transcript and Officer Giordano's testimony, there is substantial competent evidence for the district court's conclusion.

11

The district court's legal conclusion is reviewed de novo. *Gibson*, 299 Kan. at 215-16. Thus, our inquiry turns to whether a reasonable officer would believe the statement, "I don't want to talk about it now," was an invocation of the right to remain silent.

The cases offer some guidance. In *State v. Fritschen*, 247 Kan. 592, 606-07, 802 P.2d 558 (1990), the Supreme Court held the statement, "'I don't want to talk about it anymore, it hurts too much,'" did "not even reach the level of a potentially ambiguous request to remain silent; [the suspect] was saying he was upset and having difficulty talking." In other words, it was a comment on his emotional condition—not a request to end the questioning.

Similarly, in *State v. Holmes*, 278 Kan. 603, 619, 102 P.3d 406 (2004), the court determined the statement, "'I think I'll just quit talking, I don't know,'" was ambiguous because it could mean the defendant did not want to inform the police of details at that moment, but the defendant was unsure of whether to continue talking or not.

In contrast, the Supreme Court held in *Aguirre* that the statement, "'This is—I guess where I, I'm going to take my rights," was an unambiguous invocation of the right to remain silent. 301 Kan. at 955, 959. The court held that in the context it was "crystal clear that Aguirre was attempting to stop answering questions and leave the interrogation." 301 Kan. at 960. Aguirre also stated he would return to talk with the police after returning a person to their family. The court construed this statement to reinforce Aguirre's desire to end the interrogation at that point. 301 Kan. at 960.

In our view, the statement here is similar to the statements in *Fritschen* and *Holmes*, which were ruled to be admissible. Nichols' statement is very similar to the statement in *Fritschen*. However, in *Fritschen* the statement included the phrase, "it hurts too much," which factored into the court's determination that the statement was not an invocation of the right to remain silent. 247 Kan. at 606-07.

12

Also, Nichols' statement is similar to the facts in *Holmes*. Nichols saying that he did not want to talk about it *now* provides some ambiguity about whether he wanted to invoke his right to remain silent—similar to how the language "I don't know" provided ambiguity in *Holmes*. See 278 Kan. at 619. However, the word now could also indicate Nichols wanted to remain silent at that point similar to the reasoning in *Aguirre*. See 301 Kan. at 959-60. Based upon this caselaw, Nichols' statement was not an unambiguous invocation of the right to remain silent.

More importantly, the context in which the statement was given illuminates its meaning. Looking at the context of Nichols' statement, we find it reasonable for an officer to interpret Nichols' statement as an answer to the prior question and not an invocation of the right to remain silent. Officer Brown had asked Nichols to discuss the details of how Nichols obtained the gun, and Nichols responded, "I don't want to talk about it now." In the context of the questions and answers prior to Nichols' statement, it appears Nichols was answering Detective Brown's question and not invoking the right to remain silent. Nichols proceeded to answer additional questions about other subjects with no apparent hesitancy.

Nichols' statement is not an unambiguous invocation of the right to remain silent. The admission of his statements was not erroneous.

Affirmed.

13